Charles E. McGRIER, Appellant,

v.

UNITED STATES, Appellee.

No. 89–1519.

District of Columbia Court of Appeals.

Argued April 12, 1991.
Decided Sept. 24, 1991.

Hiram Puig–Lugo, Public Defender Service, with whom James Klein and Elizabeth G. Taylor, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas J. Tourish, Jr., Asst. U.S. Attys., were on the brief, for appellee. Barry Coburn, Asst. U.S. Atty., also entered an appearance, for appellee.

Before TERRY and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

TERRY, Associate Judge:

Appellant McGrier was charged with kidnapping,[1] threats to injure another person,[2] second-degree burglary,[3] and assault with intent to commit rape while armed.[4] At the close of the government's case, the trial court granted McGrier's motion for judgment of acquittal on the burglary charge, and at the end of the trial the jury found him guilty of kidnapping, threats, and simple assault.[5] McGrier brings this appeal, claiming numerous improprieties by the prosecutor. We affirm.

I. THE EVIDENCE AT TRIAL

A. *The government's case in chief*

In December 1987 Monica Fenner, a fifteen-year-old high school student, held an after-school job at the Payne Recreation Center ("the Center"). She testified that she first met McGrier while she was working at the Center on December 16. He asked her for her telephone number, which she gave to him. He called her at home later that evening and asked if he could be her boy friend. Fenner declined the invitation, telling him that she already had a boy friend, and then ended the conversation when McGrier threatened her.

Two days later, on December 18, Fenner was getting ready to leave the Center at the end of the day with her friend and co-worker, Nina Stevenson, when McGrier, who had been playing basketball inside the Center, approached the two of them and asked where they were going. Fenner replied that she was going home. She and Stevenson left the building, but McGrier and another young man followed them out of the Center and into the street, where McGrier called out to Fenner to come and talk to him. Fenner told him that she had to go home, but McGrier began to complain about their phone conversation. Stevenson urged Fenner to "come on," but McGrier threatened to "slam [Fenner's] face against the railing" if she tried to leave. When McGrier was briefly distracted, the two girls tried to flee, but McGrier ordered Fenner to stop. He then told Stevenson to leave, threatening to push her through a plate glass window if she stayed. Fenner told Stevenson to go and tell Frank Crawford, their supervisor at the Center, what was happening.

Stevenson went home and called Mr. Crawford to tell him about Fenner's plight. Crawford said that McGrier was "just playing" with Fenner, but when Stevenson said he would not let Fenner go home, Crawford agreed to "go out there and look."

1. D.C.Code § 22–2101 (1989).

2. D.C.Code § 22–2307 (1989).

3. D.C.Code § 22–1801(b) (1989).

4. D.C.Code §§ 22–501, 22–3202 (1989).

5. D.C.Code § 22–504 (1989). This was a lesser included offense of assault with intent to rape.

The conversation ended at that point. Crawford did not call the police.[6]

McGrier took the weeping and frightened Fenner to an apartment on D Street, S.E., a few blocks away. Fenner testified that she went with him because she was afraid and because he had threatened to kill her if she tried to run. After they were inside, McGrier locked the door and then, after complaining that "girls neglected him," ordered Fenner to "[m]ake love to [him]." Fenner refused, claiming that she was a virgin. McGrier then became angry and picked up a steak knife from under a table. He threatened to stab Fenner and throw her body in the alley, but then he put the knife down and began to choke her until she grew dizzy. McGrier then told Fenner that he was going to the bathroom and that she should "have [her] pants off" by the time he returned. McGrier left the room as Fenner began to unfasten her clothing.

As soon as McGrier was out of sight, however, Fenner unlocked the door and fled. She ran to a neighboring house and hid under the porch. The occupants of the house found her there and took her inside, where she described what had happened to her.[7] Eventually they took her home, and her parents called the police.

## B. *The defense case*

McGrier's defense was that Fenner voluntarily accompanied him back to the apartment on D Street. His assertion was that the two of them had been involved in an on-going relationship and on December 18 had gotten into an argument over McGrier's alleged involvement with another woman.

McGrier testified, contrary to what Fenner had said, that he first met Fenner about a week after Thanksgiving.[8] A few days after they met, he said, Fenner agreed to be his girl friend. Thereafter the two of them would meet three to five times a week, either during lunch, at a bus stop after school, or at the Center. McGrier said that Fenner frequently pressured him to spend time with her.

On December 18, McGrier testified, he met Fenner at lunchtime outside Eastern High School and reluctantly agreed to see her again later that afternoon at the Center. His reluctance, he said, was due to his desire to avoid Fenner's complaints about his relationship with another woman.

When they met at the Center that afternoon, Fenner chastised him about the fact that he had been seen with another woman. McGrier testified that Stevenson was with them initially, but then became angry that Fenner would not go with her and went away. McGrier and Fenner then went to the apartment on D Street. When they got there, he began to watch television, but Fenner started an argument with him. When he ignored her, she left. McGrier denied having a knife and denied trying to force Fenner to have sex with him.

Frank Crawford testified on McGrier's behalf. He said that he had seen McGrier and Fenner together at the Center some time before December 18 "playing like two young people would play." On direct examination he stated that he saw this on several occasions, "a week or two" before December 18. He expanded his testimony on cross-examination, recalling that he had seen McGrier and Fenner together "almost every day," more than thirty times during the two months prior to December 18. Crawford later testified, somewhat incon-

---

6. Stevenson also testified that when she called Crawford again a few minutes later, Crawford told her that he had gone outside but had not seen anyone. When defense counsel objected to this testimony as hearsay, the objection was sustained, but Crawford later testified to the same effect.

7. The occupants of the house, Robert Faulk and Edith Joynes, both testified at trial. Faulk said that he found Fenner crouched on the ground outside his window, sobbing and exclaiming, "Help me, help me, he's trying to kill me."

After he took her into the house, she was crying so hard that for about ten minutes she could not even speak. When Joynes finally managed to calm her down, she recounted what had happened, telling essentially the same story she told the jury. The court admitted the testimony of Faulk and Joynes about what Fenner had said under the excited utterance exception to the hearsay rule.

8. The trial court took judicial notice that in 1987 Thanksgiving fell on November 26.

sistently, that McGrier had been absent from the Center for a period of ten to twenty days in late November or early December.

## C. *The government's rebuttal*

The government began its rebuttal case with a stipulation that McGrier was "not at or near the Payne Recreation Center or Eastern High School" from November 25 through December 13, 1987.[9] The effect of this stipulation was to rebut McGrier's testimony that he had been seeing Fenner regularly during that period, and also to rebut Crawford's testimony that he had seen McGrier and Fenner together more than thirty times prior to December 18. The government also presented three other witnesses from the Payne Center who testified that they had seen McGrier and Fenner together on only one or two occasions, as well as evidence that Fenner began work at the Center on November 23—only two days before McGrier's absence from the area.

## II. A WORD ON NOMENCLATURE

McGrier seeks reversal of his conviction on the ground that the prosecutor engaged in several instances of "misconduct" in his argument to the jury. The government responds with the argument that "the very serious charge of 'prosecutorial misconduct' is ordinarily wholly inappropriate in the context of a criminal appeal," and urges us to adopt some other term to describe harmful remarks by a prosecutor. For two reasons, we think the government's point is well taken.

First, the real issue in cases such as this is not whether the prosecutor engaged in some kind of misconduct but whether the trial judge should have intervened if and when the prosecutor went beyond the limits of permissible argument. As we pointed out in *Irick v. United States*, 565 A.2d 26 (D.C.1989):

[I]t is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel.... [A]bsent some improper ruling or omission by the trial judge, we cannot ordinarily reverse a conviction, and our ultimate focus must therefore be on what the judge did or failed to do.

*Id.* at 33 (citations and footnote omitted). The term "misconduct" implies that the prosecutor acted with an improper motive, but from our standpoint the prosecutor's motive is essentially irrelevant. What matters instead is the effect of the disputed comment on the verdict.[10] When a claim is made on appeal that a prosecutor said something during a trial that harmed the defense, the threshold issue for us is whether the challenged remark was improper. If we decide that it was, we then must determine whether that remark had any adverse effect on the outcome of the trial. Nowhere in our analysis do we consider the prosecutor's motive in saying what he or she said. Indeed, the record in all but the rarest of cases will be insufficient for us to discern what the prosecutor's motive may have been, and we obviously cannot read the prosecutor's mind.

Second, the term "misconduct" has adverse ethical implications which, in the great majority of cases, are surely unwarranted. An accusation of misconduct against a member of the bar is, as the government reminds us, a "very serious charge." It should not be made without a very solid factual foundation, especially when the accuser is also a member of the bar. In recent years it has been applied all too freely, and without serious reflection, to statements made by attorneys—prosecutors and defenders alike—in the heat of a trial, when semantic and stylistic precision are not uppermost in their minds. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646–647, 94 S.Ct. 1868, 1872–1873, 40 L.Ed.2d 431 (1974). We do not mean to

---

9. What the jury was not told was that McGrier was incarcerated in a juvenile facility during this time. He escaped from that facility on December 13.

10. As the Supreme Court has said in another context, "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

suggest that there are never cases in which an act or omission by an attorney could be called misconduct; that term would almost certainly apply, for example, to the withholding of exculpatory evidence in a criminal case. *See Irick v. United States, supra*, 565 A.2d at 33 n. 16. In general, however, we think that the word "misconduct" is overused, and that some less sinister name should be given to the rhetorical excesses of attorneys who say what they should not say when engaged in forensic combat.

That said, we turn to the assertedly improper remarks by the prosecutor in this case.

### III. McGrier's Claims of Error

■ Our task is well defined by the case law. First, we must determine whether any or all of the challenged comments by the prosecutor were improper. *Dixon v. United States*, 565 A.2d 72, 75 (D.C.1989); *Irick v. United States, supra*, 565 A.2d at 32; *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985). If we conclude that they were, we must then, viewing the remarks in context, "consider the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Dixon, supra*, 565 A.2d at 75 (citation omitted).

■ If we find that a particular comment was improper, and if the issue of impropriety was properly preserved for appellate review, we will nevertheless affirm the conviction unless the defendant suffered "substantial prejudice" as a result. *Williams v. United States*, 483 A.2d 292, 297 (D.C.1984), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). The test for determining "substantial prejudice" is well settled:

> whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue af-

fected by the error, and the steps taken to mitigate the effects of the error. *Gaither v. United States*, 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (footnotes omitted), quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

■ The rule is far more stringent when the defendant has failed to object to the prosecutor's supposedly improper remarks. In that situation the defendant cannot obtain reversal without a showing of plain error, *i.e.*, error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc); *accord, e.g., Dixon v. United States, supra*, 565 A.2d at 75; *Irick v. United States, supra*, 565 A.2d at 32. When there has been no objection at trial, reversal of a conviction based on improper prosecutorial argument is appropriate only in a "particularly egregious" case, when "a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations and internal quotation marks omitted).

We consider each of the prosecutor's challenged remarks in light of these principles.

#### A. *The effect of the stipulation*

McGrier contends that the prosecutor, in both his initial summation and his rebuttal argument, impermissibly stated his personal opinion that Crawford's testimony was incredible. The pertinent portion of the prosecutor's initial summation is as follows, with the challenged language in italics:

> Frank Crawford got up on that witness stand and he said that he saw Monica Fenner and Charles McGrier together as many as 30 or more times. He said that he distinctly remembered that they were together almost every day for the month or two months before this incident occurred. That the most that Charles McGrier ever could have missed, in other words, the longest period when he could not—when he was not with Monica Fen-

ner at the Payne Center, was one or two days. That virtually every single day from two months before the incident until December 18th, 1987, he testified, Monica Fenner and Charles McGrier were together at that center.

Well, ladies and gentlemen, that looked, when you heard it, like pretty devastating testimony for the government's case, didn't it? Because that was directly contradictory [to Monica Fenner's testimony]. She said she was only with him one other time before this incident happened.

And now here's an adult. She's just a kid. Nina Stevenson's just a kid. Richard Powell [another government witness], he's just a kid. *But Frank Crawford, he's an adult, a respectable person. Why would Frank Crawford, such a respectable person, get up on that witness stand and lie about a case that he's not even directly involved in? Pretty devastating stuff.*

Well, ladies and gentlemen, what do you know about Frank Crawford's testimony? You know what I submit to you is the most important thing in this case. You know a stipulation that was read at the beginning of the government's rebuttal case. A stipulation, ladies and gentlemen, as the judge has already instructed you, is something that you can take as absolute, uncontested, unquestionable fact.

And what does that stipulation say? It says that the parties stipulate that from November 25th, 1987, through December 13th, 1987, the defendant Charles McGrier was not at or near the Payne Recreation Center or Eastern High School. That's like three weeks, ladies and gentlemen. And that is absolute fact.

So when Frank Crawford says that for two months up until the time of the incident, he saw them together nearly every day, he saw them more than 30 times, he saw—and when he saw them together, the most that they were not together was one or two days, that obviously cannot be the case.

Well, ladies and gentlemen, you could say to yourselves, maybe Mr. Crawford, I don't know how he could have made that mistake, but maybe he was thinking about sometime before November 23rd or November 25th.

But gee, ladies and gentlemen, you heard in the government's rebuttal case that Monica Fenner, according to the records of the Department where she worked, she started working at that center on November 23rd, 1987. Before that, she wasn't even working there.

And you heard Charles McGrier testify that when did [sic] he start coming to that center? In other words, there was a lull or a break, and when did he start coming back? It was after Monica Fenner started working there.

*Well, ladies and gentlemen, I submit to you that you should do the following with Frank Crawford's testimony. You should disregard it in its entirety. It is entitled to no weight whatsoever. It cannot be so. It is in direct conflict with stipulated facts.*

Defense counsel did not object to any of these statements.

The prosecutor later returned to the same point in rebuttal:

The single most important piece of evidence that came out in this case, she [defense counsel] referred to it in about one and a half seconds, and only once. *That stipulation, ladies and gentlemen, says in effect that what Mr. Crawford testified to can't be right. It must be wrong entirely. And it says, ladies and gentlemen, that what the defendant testified to must also be wrong entirely.*

Ms. MARSHALL [defense counsel]: Objection, Your Honor.

THE COURT: Overruled. This is argument.

\*      \*      \*      \*      \*      \*

And, ladies and gentlemen, Mr. Crawford said that for one and a half months he—I didn't make him say it. Mr. Crawford said that for one and a half or two months before this incident occurred he saw them together, Monica [Fenner] and

Charles McGrier, almost every day and that the most he could have missed was one or two days. Well, ladies and gentlemen, [that is] totally, completely, unequivocally wrong. Ms. Marshall has stipulated that for a lengthy period of time, November 25th through December 13th, Charles McGrier could not have been there. Therefore, ladies and gentlemen, it is a fact that he was not there. And yes, Mr. Crawford sat up there and testified that he was.

The defense in this case ... is that there was a relationship that arose between [Fenner and McGrier], that the relationship arose by Eastern High School seven days after Thanksgiving, directly within the period covered by the stipulation when Charles McGrier could not have been there. That they were going out during that whole period, that they saw each other constantly, both the defendant and Mr. Crawford said that the most they could have missed was maybe one or two days, and the defendant said he didn't think he missed any days.

\* \* \* \* \* \*

Was there a relationship between the two of them? Could that relationship have begun right after Thanksgiving? Could it have continued? It could not have. It is a stipulated fact.

■ It is improper for a lawyer to express a personal opinion about a witness' veracity during arguments to the jury. *Mitchell v. United States*, 569 A.2d 177, 184 (D.C.) (citing cases), *cert. denied*, — U.S. ——, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990); *Jones v. United States*, 512 A.2d 253, 257 (D.C.1986) ("This court has repeatedly condemned assertions by counsel that a witness has lied on the witness stand" (citing cases)). On the other hand, saying that a witness' testimony is incredible is permissible when that is a logical inference from the evidence and not merely the opinion of counsel. *Irick v. United States, supra*, 565 A.2d at 35. "Characterizing testimony as incredible is an accepted and proper form of comment on contradictory testimony." *Dyson v. United*

*States*, 418 A.2d 127, 130 (D.C.1980); *see · Mitchell, supra*, 569 A.2d at 184 n. 6 ("the prosecutor's suggestion that Mr. Giles, a key defense witness, was not telling the truth was a permissible comment emphasizing contradictory evidence").

■ The purpose of the rule prohibiting lawyers from expressing their personal opinions on the veracity of a witness is to prevent the jury from considering the lawyer's opinion (which is not evidence) when evaluating the credibility of that witness. *See Irick, supra*, 565 A.2d at 36 (lawyer must not add "his own unsworn testimony to the evidence in the record" (footnote omitted)). The rule clearly does not prevent a lawyer from arguing that the testimony of a particular witness should not be believed when the jury could reasonably draw that inference from contradictory evidence in the record, for in those circumstances there is no danger that the jury will consider the inadmissible and irrelevant opinion of the lawyer. "A comment will be within the acceptable range as long as it is in the general nature of argument, and not an *outright* expression of opinion." *Id.* (emphasis in original).

McGrier claims that "[w]ithout the stipulation there is no doubt the prosecutor's argument would have been improper.... The presence of the stipulation does not make the argument proper." We agree with the first part of this assertion, but not the second; the stipulation made all the difference. While the challenged remarks would almost surely have been improper without it, they were clearly a permissible comment on the patent contradiction between the stipulation and the testimony of Crawford (and McGrier). The prosecutor acted properly in stressing this inconsistency and urging the jury to accept the stipulation and to "disregard [Crawford's testimony] in its entirety" and give it "no weight whatsoever." McGrier's contention that this argument "effectively told the jury that, in the prosecutor's view, the witnesses were liars" is simply incorrect. The prosecutor's remarks were nothing more than an argument that the jury could reasonably infer from the very facts which the

defense had stipulated that Crawford and McGrier were not telling the truth. We see no basis for reversal here.[11]

### B. *The possible bias of Mr. Crawford*

The prosecutor attempted to persuade the jury that Crawford was a biased witness by showing that he was seeking to avoid any personal liability for his actions after Nina Stevenson told him about the encounter between McGrier and Fenner. Crawford testified that Stevenson had called him on the afternoon of December 18 and related her concern that McGrier might be harming Fenner. He said that he went outside and looked for them, but when he did not see them, he went back into his office. The prosecutor asked if Crawford had gotten in trouble with his superiors for not reporting the incident to the police, and after Crawford said he had not, the prosecutor asked if Crawford had been transferred to another job (about which he had testified earlier) as a result of his response to this incident. Defense counsel objected, but the court did not rule on the objection, perhaps because Crawford had already answered. Crawford then said that he had been reassigned because his expertise in solving drug problems was needed at another location, adding that he had worked at the Payne Center for almost fifteen years before his transfer. Defense counsel moved to strike this testimony on the ground that the prosecutor lacked any basis for pursuing this line of questioning. The court denied the motion, and the questioning then turned to other matters.

Later, in his summation, the prosecutor first argued that Crawford's testimony was, in light of the stipulation, not to be believed. The prosecutor then continued:[12]

> Why would Frank Crawford have [testified incorrectly]? Well, ladies and gentlemen ... you may conclude from the evidence that he may have done this because Frank Crawford, by his own admission, was on duty at the time this incident began. That Frank Crawford received a telephone call from Nina Stevenson. That Nina Stevenson was excited. That she told him that Charles was doing something to Monica. And ladies and gentlemen, and I submit to you, he said it pretty defensively, ladies and gentlemen, didn't Mr. Crawford say, the reason I didn't do anything about it was because it wasn't warranted.
>
> Well, ladies and gentlemen, how did he know if it was warranted? *He went out there, by his own testimony, and looked and they were already gone. But he didn't do anything, ladies and gentlemen. He didn't even call the police. Isn't that a man who is afraid of the possibility of some sort of legal action? Doesn't that provide Mr. Crawford with a motive to greatly, greatly exaggerate the number of times he saw them together? There is no question that he exaggerated. There is no way what he said could be correct.*

Defense counsel never objected to this argument. McGrier now contends, however, that the trial court erred in denying his motion to strike the prosecutor's questions which suggested that Mr. Crawford might be biased, on the ground that the prosecutor lacked a good faith basis for this line of questioning.

■ Although an attorney attempting to show a witness' bias may not ask questions that are "totally groundless," *White v. United States*, 297 A.2d 766, 768 n. 1 (D.C.1972) (citation omitted), a question based on a "well reasoned suspicion" rather than an "improbable flight of fancy" is

---

**11.** We are a bit troubled by the prosecutor's use of the word "lie" ("Why would Frank Crawford ... get up on that witness stand and lie about a case that he's not even directly involved in?"). We have cautioned against such accusations in a number of cases, *see Jones v. United States, supra,* 512 A.2d at 257, and we urge lawyers to excise that word from their vocabularies when presenting arguments to a jury. In the context of this case, however, we agree with the government that this comment "was amply supported by the evidence with which it was directly and accurately linked...." Moreover, what is sauce for the prosecutor is sauce for defense counsel, who should likewise have refrained from accusing Monica Fenner of telling "a lie [that] was calculated, it was thought about."

**12.** The remarks now challenged by McGrier appear in italics.

permissible. *United States v. Pugh*, 141 U.S.App.D.C. 68, 71, 436 F.2d 222, 225 (1970). Stated another way, a question seeking to reveal the bias of a witness is proper if "the suspected cause of bias [is] itself plausible within the framework of facts that neither party has contested." *Scull v. United States*, 564 A.2d 1161, 1164 n. 4 (D.C.1989).

█ We are satisfied that the uncontested facts in this case gave the prosecutor a sufficient basis to pursue this line of questioning. It was undisputed that Crawford was Fenner's supervisor while she worked at the Center. It was also undisputed that shortly after Fenner left work on December 18, Stevenson called Crawford with her concern that McGrier might be harming Fenner. It was undisputed that Crawford made a brief investigation, but did not call the police. Finally, it was undisputed that Crawford was transferred "shortly after" this incident. Within this "framework of facts that neither party has contested," it was certainly "plausible" that Crawford might have either feared or been subject to disciplinary action by his employer, the Department of Recreation.[13] Thus the court did not err in allowing the prosecutor to ask these questions.

McGrier also complains that the prosecutor improperly argued during closing argument that Crawford was a biased witness. He contends that the only foundation for the prosecutor's argument that Crawford had a reason to fabricate the number of times he saw McGrier with Fenner lay in the prosecutor's own questions on cross-examination, not in Crawford's answers or any other testimony. McGrier therefore asserts that the prosecutor improperly argued facts not in evidence (namely, that Crawford was a biased witness) to the jury.

█ Disregarding for the moment the fact that McGrier did not preserve any objection to the prosecutor's closing argument,[14] his present contention is based on a misreading of the record. On cross-examination the prosecutor asked Crawford whether he had *actually* been disciplined for his actions. As we have already discussed, there was ample evidence to give the prosecutor a good faith basis for this line of inquiry. Because Crawford denied that he had been disciplined, it would have been improper for the prosecutor to state or imply in his summation that Crawford had in fact been disciplined. But that is not what the prosecutor said. Rather, he argued to the jury that Crawford was "a man *who is afraid of* the possibility of legal action," and that he therefore had a motive to exaggerate the number of times he saw McGrier and Fenner together. The prosecutor's argument was not that Crawford *had been* subjected to disciplinary action, but that he *feared* such action, a topic which had not been explored during the contested cross-examination.

The evidence was clearly sufficient to support the argument that Crawford feared some sanction as a result of his response to the incident on December 18

---

**13.** McGrier contends that, because Crawford denied being disciplined for his action (or inaction), there was no evidence of discipline and hence no basis to argue that he was biased. We cannot agree. Crawford's denials notwithstanding, there was clearly sufficient evidence—namely, Crawford's failure to intercede or to call the police and his subsequent transfer—to support a hypothesis that he was or might have been disciplined. The prosecutor's questions on cross-examination were therefore based on "well reasoned suspicion."

**14.** McGrier contends that his timely objection to the prosecutor's cross-examination of Crawford preserved his objection to the closing argument. We disagree. The purpose of the contemporaneous objection rule is to give the trial court an opportunity to correct any potential errors at the time they are made. *See Dixon v. United States, supra,* 565 A.2d at 80. It is true that "an objection to evidence, once made and overruled, need not be renewed to the same type of evidence subsequently received." *Wilkins v. United States,* 582 A.2d 939, 942 n. 7 (D.C.1990). This "continuing objection" doctrine does not frustrate the purpose of the contemporaneous objection rule because the trial court has already had an opportunity to decide the point at issue. In this case, however, defense counsel's objection to the prosecutor's cross-examination was that the prosecutor lacked a good faith basis for asking the question. The proper objection to the closing argument would have been (as McGrier argues here) that it was based on facts not in evidence. Because this was a different ground for objection, *Wilkins* is inapposite.

and therefore had a motive to overstate the number of times he saw McGrier with Fenner. As the prosecutor pointed out, the uncontroverted testimony established that Crawford was Fenner's supervisor and that Stevenson told him of her concern that Fenner might be in trouble. Crawford admitted that he felt a "duty" to investigate the incident after Stevenson called him. Despite that duty, Crawford did not call the police or take any further steps when his own investigation of the matter yielded no results. This evidence provided an adequate basis to argue that Crawford at least had a motive to "greatly, greatly exaggerate the number of times he saw them together."

### C. *McGrier's interest in the outcome of the case*

■          After reviewing the testimony of each defense witness and pointing out that there was no way to reconcile Crawford's testimony with the stipulation, the prosecutor turned to McGrier's testimony:

Well then, ladies and gentlemen, what are you left with? You're left with the testimony of Mr. McGrier himself. Well, what do you make of that man's testimony, ladies and gentlemen? The first thing to consider when evaluating Mr. McGrier's testimony is that Mr. McGrier is the defendant in this case. Mr. McGrier has what is known as a stake in the outcome. He has, in other words, a lot riding on what happens in this trial, a lot at stake depending on whether you come back guilty or not guilty. He has a motive to testify in a way that is to his advantage.

Defense counsel interrupted at this point with an objection, but the court overruled it. The prosecutor then called the jury's attention to McGrier's demeanor on the witness stand, noting that he was often evasive, and also stressed the glaring inconsistency between McGrier's testimony and the stipulation.

McGrier now contends that the prosecutor's closing argument "virtually instructed the jury, given appellant's vital interest, to disregard appellant's testimony as inherently incredible and unreliable." He asserts that the prosecutor urged the jury to consider only his vital interest in the outcome and "to proceed no further in evaluating [his] testimony." McGrier misreads the record. The prosecutor urged the jury to consider all of the evidence in the case, particularly the stipulation, in evaluating McGrier's testimony. Any suggestion that the prosecutor, after focusing on McGrier's vital interest in the case, "urged the jury to proceed no further" is simply unfounded. On this point we hold that the prosecutor's argument was entirely proper.

McGrier relies on *Clifford v. United States,* 532 A.2d 628 (D.C.1987), to support his contention that the prosecutor may not point out the defendant's vital interest in the outcome of the case. In *Clifford* the judge instructed the jury that it "may consider the fact that the defendant has a vital interest in the outcome of this trial" in weighing the defendant's testimony. Although we affirmed the conviction, we said that trial judges should refrain from giving "[i]nstructions singling out the defendant and specifically identifying the defendant's interest in the trial...." *Id.* at 640. There is one obvious difference between *Clifford* and the instant case: *Clifford* involved a judge's instruction to the jury, whereas this case involves the prosecutor's argument. That distinction is critical. While a trial judge may not give an instruction "singling out the defendant," there is no rule that prevents a prosecutor from making an argument that identifies the defendant's interest in the outcome of the trial. *Clifford* does not support McGrier's claim of error.

### D. *The missing witness argument*

McGrier testified that he had met with Fenner on numerous occasions over the course of several weeks. He testified that there were often other persons, usually students from Eastern High School, in the vicinity during these meetings but that he did not know any of their names.

In his closing argument the prosecutor said:

Didn't he [McGrier] say that on every one of those numerous times [when he

claimed to have met with Fenner], there was never anyone else around whose names he recalled?

Why would he say that, ladies and gentlemen? It is interesting that he does not provide the names of anyone else who was around. There is no way to verify.

Although defense counsel never objected to these comments, McGrier now seeks reversal on the ground that this was an improper missing witness argument. We need not decide whether the argument was improperly made because, even if it was, there was no plain error.

■ If a defendant testifies that there is a witness who could give an account of the pertinent events consistent with the defense theory of the case, but that witness is never called to testify, a prosecutor—with court permission—may ask the jury to infer from the witness' absence that his or her testimony would be unfavorable to the defendant.[15] *Arnold v. United States*, 511 A.2d 399, 415 (D.C.1986). An "incomplete" or "partial" missing witness argument is one in which the lawyer simply notes the absence of a witness but refrains from asking the jury to draw the adverse inference. *Id.* at 416.

■ Because a missing witness argument "creates evidence from the absence of evidence," it may only be made with the court's permission. *Burgess v. United States*, 142 U.S.App.D.C. 198, 206, 440 F.2d 226, 234 (1970). Before giving such permission, the trial court must first ascertain "that the witness [is] able to 'elucidate the transaction' such that he might be expected to be called, and that he [is] 'peculiarly available' to the party against whom the inference is made." *Thomas v. United States*, 447 A.2d 52, 57 (D.C.1982). The trial court may allow the missing witness argument (or may itself give a missing witness instruction) only after it has determined that both of these conditions have been met. *E.g., Parks v. United States*, 451 A.2d 591, 614 (D.C.1982), *cert. denied*,

461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *Gass v. United States*, 135 U.S.App.D.C. 11, 19, 416 F.2d 767, 775 (1969). We also held in *Arnold, supra,* that a lawyer proposing to make an incomplete missing witness argument, "even if it goes no further than to note the absence of the witness, should first obtain permission from the court to do so in order to avoid injecting prejudicial error into the trial." 511 A.2d at 416 (citation omitted).

In *Alston v. United States*, 552 A.2d 526 (D.C.1989), we recognized a narrow exception to the rule that a lawyer may never, without prior permission from the court, comment on the opposing party's failure to produce a witness. When the defendant in a criminal case alleges that there is another person "whose conduct as described [by the defendant] would have exonerated the accused from commission of the charged crime," it is permissible for the prosecutor to argue that the *existence* of this person "was merely a product of [the] defendant's imagination." *Id.* at 528. The defendant in *Alston* was charged with receiving a stolen car, which he was driving when he was arrested. He testified that a person he knew only as "Larry" picked him up in the car, parked it illegally, and then went into a building to get some money from his girl friend. The defendant claimed that he then noticed an approaching police car and got into the driver's seat in order to move the car and avoid a parking ticket. The prosecutor, noting the defendant's failure to produce Larry, argued that there was no such person. We held that this was not a missing witness argument because it asked the jury to infer that the supposed witness did not even exist, not that the witness, if called, would testify unfavorably to the defense.

The government argues that this case fits within *Alston* and that the prosecutor was simply arguing that "the absence of corroboration" from the people who allegedly saw McGrier with Fenner "is further evidence that [McGrier's] testimony [was]

---

15. The prosecutor may also ask the court to instruct the jurors that they may draw such an inference from the fact that the supposed witness has not testified, or the court may so instruct *sua sponte.*

fabricated." The government claims that the prosecutor was merely saying that the witnesses did not exist, which *Alston* permits. In the general sense, this is true: the prosecutor could argue that there was no one who saw McGrier with Fenner, and that any such witness therefore did not "exist." McGrier maintains, however, that what the prosecutor really wanted the jury to infer was that no witness could testify that he or she had seen McGrier with Fenner because McGrier had not been with Fenner, not because there was no such witness. This was not an *Alston*-type argument, McGrier contends, but an incomplete missing witness argument, which the prosecutor should have sought permission to make before he made it.

We need not decide whether the prosecutor's argument was proper under *Alston* or improper under *Arnold* and the line of cases going back to *Gass*. Because defense counsel made no objection at trial, we may not reverse unless the court's failure to intervene *sua sponte* and take corrective measures amounted to plain error. *Irick v. United States, supra,* 565 A.2d at 32–33. We can find no plain error on the record before us.

We are guided by our opinion in *Arnold,* in which we concluded that any error resulting from an improper partial missing witness argument was harmless. *Arnold, supra,* 511 A.2d at 416. We noted there that the prosecutor made the challenged remark only once, that the trial judge did not give a missing witness instruction, and that the evidence against the defendant was strong. In this case, similarly, the prosecutor made the challenged argument only once, and only to rebut McGrier's claim that he had been with Fenner almost daily during late November and early December 1987. McGrier's stipulation that he was not around during that time was far more damaging to his defense than the prosecutor's argument. Moreover, the asserted impropriety, if there was one, lay mainly in the prosecutor's failure to seek permission for the argument, rather than in what he actually said. As in *Arnold* we found harmless error, we conclude in this

case *a fortiori* that the prosecutor's argument, even if improper (which we do not decide), did not give rise to plain error.

## E. What McGrier "knew" or "thought"

In his rebuttal argument the prosecutor said:

> Counsel in her opening statement and also in her closing argument has said that it is improbable, that is it unlikely that Charles McGrier would have gone into the bathroom, thereby allowing Monica Fenner to run away. Well, ladies and gentlemen, Charles McGrier *knew* exactly what he was doing. Charles McGrier *knew* just exactly how scared he had that young woman [*sic*]. Charles McGrier *knew* that she was following him, that she was doing his bidding. He had her crying. He had her pleading with him. He had her believing that [*sic*] the threats that he was making against all of her relatives. Charles McGrier *was supremely confident* in that situation. And Charles McGrier *thought,* well, he thought that if he went into that bathroom after he had ordered her to get her clothing off, he thought that when he came back out she would be standing there stark naked and ready to go.
>
> Fortunately for Monica Fenner, she had the presence of mind to try to unlock the door that Charles McGrier had locked behind them and tear out of there. [Emphasis added.]

Although defense counsel did not object at the time, McGrier now contends that the prosecutor improperly argued facts not in evidence. Specifically, he asserts that "there was no evidence introduced about what Charles McGrier knew, felt, or thought at the time he was inside the apartment with Monica Fenner."

It is improper for any attorney to argue facts not in evidence. *Coreas v. United States,* 565 A.2d 594, 604 (D.C.1989); *Morrison v. United States,* 547 A.2d 996, 999 (D.C.1988); *see Mitchell v. United States, supra,* 569 A.2d at 184 (improper for prosecutor to hypothesize that defendant "felt confident after he moved [victim's] body"); *Lewis v. United States,* 541 A.2d 145, 146–147 (D.C.1988). It is

permissible, however, to argue what a defendant "was probably thinking" when there is evidence of behavior which would support an inference about the defendant's state of mind. *Irick v. United States, supra,* 565 A.2d at 37; *see also Jefferson v. United States,* 558 A.2d 298, 302 (D.C.1989) (permissible to argue what a witness "knew in his heart" on the basis of evidence of his behavior), *cert. denied,* 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990).

■■■ The evidence in this case showed that Fenner followed McGrier to the apartment, did what he told her to do, pleaded with him, and acted on the basis of his threats against her. A juror could reasonably infer from this evidence that McGrier "knew what he was doing" and "knew just exactly how scared" Fenner was, and that he was therefore "supremely confident" that he could leave her alone while he went to the bathroom. We see no impropriety here.

McGrier's reliance on *Coreas, Mitchell,* and *Lewis* is misplaced. *Coreas* involved the prosecutor's invention, for the first time during rebuttal, of a new theory of the case—that the defendant lay in wait for the victim—when there was no evidence to support that theory. In *Lewis* the prosecutor argued that a witness saw the defendant with a gun when nothing in the record indicated that the witness had ever seen a gun. As for *Mitchell,* the government correctly points out in its brief that only one sentence in that opinion has anything to do with the issue presented here:

Appellant's claim that the prosecutor made comments that had no evidentiary support are meritless ... except where the prosecutor hypothesized that appellant felt confident after he moved [the victim's] body.

*Mitchell, supra,* 569 A.2d at 184 (citations omitted). We held that the defendant was not prejudiced and affirmed his conviction. The *Mitchell* opinion does not suggest in any way that a prosecutor is prohibited from urging the jury to draw inferences about the defendant's state of mind when the evidence supports those inferences.

## IV. CONCLUSION

McGrier claims that the prosecutor engaged in five specific improprieties, whose individual and cumulative effect was to deny him a fair trial. We conclude otherwise. The only even arguable impropriety committed by the prosecutor was his failure to seek advance permission before making what may—or may not—have been an incomplete missing witness argument. But that argument elicited no objection from defense counsel, and we hold that it did not give rise to plain error. The judgment of conviction is therefore

*Affirmed.*