Alphonzo CLEMENTS, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–324.

District of Columbia Court of Appeals.

Submitted Dec. 5, 1995.

Decided Dec. 28, 1995.

---

Mary E. Davis, appointed by the court, Washington, DC, for appellant.

Magdalena A. Bell, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and Robert A. Spelke, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before FERREN and KING, Associate Judges, and PRYOR, Senior Judge.

FERREN, Associate Judge:

A jury found appellant, Alphonzo Clements, Jr., guilty of assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1989 Repl.); possession of a firearm during a crime of violence or dangerous offense, *id.* § 22–3204(b) (Supp.1994); carrying a pistol without a license, *id.* § 22–3204(a); possession of an unregistered firearm, *id.* § 6–2311(a); and unlawful possession of ammunition, *id.* § 6–2361(3). Clements contends that (1) the trial court erred in admitting in evidence hospital records indicating the victim's degree of alertness at the time he was admitted to the hospital, and that (2) statements made by the prosecutor in closing argument constituted prosecutorial misconduct requiring reversal. We affirm.

## I.

The government's evidence indicated that at approximately 12:00 a.m. on July 23, 1993, Joseph Hackney drove Roderick Stringer to an apartment complex at Douglas Place, S.E. On the way, Stringer purchased two twenty-ounce beers, which he and Hackney consumed. When they reached the complex at Douglas Place, Hackney screeched his tires as he pulled into the parking lot. Clements, who was known to Hackney by the nickname "Bouchey," approached both men as they sat in the car and told Hackney, "don't be coming in my damn neighborhood making that noise with your car." After a brief argument, Clements walked away from the car while Hackney remained inside it with Stringer.

Some time later, as Stringer was about to leave the car, Clements ran up to the driver's side, pulled out a gun, and shot Hackney six times as Hackney attempted to leave the car on the passenger side. When police and rescue personnel arrived on the scene, Hackney informed the police that "Bouchey" was his assailant. He then lost consciousness. After transport to D.C. General Hospital, Hackney was admitted into the intensive care unit with gunshot wounds to his abdomen, left arm, and left leg. Hackney then regained consciousness. As part of the admission process, Hackney was screened for drugs, and a blood test revealed a blood alcohol level of .110. Hospital staff also assessed Hackney's level of awareness and found that he was "alert, oriented X 3," *i.e.*, "alert to person, place and time," and had a Glasgow Coma Scale (GSC) rating of 15, or normal, at the time of his arrival.

Clements' trial began on January 11, 1994. The government presented extensive testimonial evidence to establish that Clements was the gunman who shot Hackney, including the testimonies of Hackney, of residents at Douglas Place, and of law enforcement officers who investigated the crime.[1] In order to show Clements' specific intent to kill, the government also presented the testimony of Dr. Wendell Perry, the senior resident on call at D.C. General Hospital when Hackney

---

1. Hackney testified as to the events that took place and identified Clements as his attacker. Selena Mitchell, a resident at Douglas Place, testified that she had seen Clements arguing with Hackney at approximately 2:15 a.m. on the night of the shooting. Tonia Williams testified that she had received a *telephone call from Clements* shortly after the shooting in which Clements inquired whether Hackney had died and whether the police knew who was responsible. Metropolitan Police officers August DeFrance, Peter Woodburn, Richard Brown, and Timothy Curtis, and FBI agent Jerrold Bamel, also appeared at trial. DeFrance and Woodburn testified that Hackney had identified Clements at the scene and had not smelled of alcohol or slurred his speech. Curtis and Brown discussed the physical evidence found at the scene. Bamel testified that he had visited Hackney at D.C. General Hospital, that Hackney had told Bamel that "Bouchey" had shot him, and that Hackney had made a positive photo identification of Clements.

was admitted. Dr. Perry discussed the life-threatening nature of Hackney's injuries, and also explained the initial assessments of Hackney's alertness made upon his admission. Finally, the government introduced in evidence hospital records from D.C. General Hospital relating to Hackney's treatment on the night he was shot.

The defense theory was that Clements had argued with Hackney on the night of the shooting but that he was not responsible for shooting Hackney. The defense tried to discredit Hackney's testimony by suggesting, through defense witnesses including Clements, that Hackney's perception of events and his identification of Clements were unreliable because Hackney had been drunk at the time. The defense also presented the expert testimony of a forensic toxicologist, Dr. Nicholas T. Lappas, who opined on the basis of Hackney's weight, height, food and alcohol consumption, blood alcohol level, and behavior on the night of the shooting that Hackney had been intoxicated. Defense counsel had also objected to introduction of the hospital records that noted Hackney was "alert, oriented X 3," as well as the records that reflected Hackney's GSC rating at the time he was admitted to the intensive care unit.

On January 25, 1994, Clements was convicted on all counts for which he had been indicted. He was sentenced on March 22, 1994, to prison terms totaling 9 to 25 years and filed a timely notice of appeal the next day.

## II.

■ Clements contends the trial court erred in admitting under the business records exception to the hearsay rule hospital records reflecting Hackney's level of conscious awareness at the time of his admission. Clements primarily argues that entries describing Hackney as "alert, oriented X 3," as well as the entries indicating Hackney's GSC test results, amounted to medical "opinions" about which competent physicians would differ, *see Durant v. United States,* 551 A.2d 1318, 1323–24 (D.C.1988), and thus fell outside the scope of the business records exception. We conclude that, because both entries reflected "objective medical data re-corded by the hospital officials as part of their regular patient work-up," *Sullivan v. United States,* 404 A.2d 153, 158–59 (D.C. 1979), rather than "subjective judgment or conjecture," *see Durant,* 551 A.2d at 1324, they were properly admitted under the business records exception.

The business records exception is codified in our jurisdiction in Super.Ct.Civ.R. 43–I (1995), which provides:

> Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

Rule 43–I is applicable to criminal cases in Superior Court. *See* Super.Ct.Cr.R. 57(a).

Because "[h]uman life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks," *Smith v. United States,* 337 A.2d 219, 222 (D.C.1975) (quoting *Thomas v. Hogan,* 308 F.2d 355, 361 (4th Cir.1962)), we generally regard most, but not all, hospital entries as particularly trustworthy business records. The natural distinction that we employ is between (1) entries of medical facts, routinely performed procedures, and diagnoses about which competent physicians would agree, and (2) entries reflecting subjective judgment or conjecture about which there would likely be disagreement. *See Adkins v. Morton,* 494 A.2d 652, 662 (D.C.1985); *New York Life Ins. Co. v. Taylor,* 79 U.S.App.D.C. 66, 69, 147 F.2d 297, 300 (1945).

Applying this distinction, we have upheld admission of nursing notes describing a pa-

tient's behavior and lab reports indicating a patient's PCP in the bloodstream, *see Durant*, 551 A.2d at 1325–26, a diagnosis of physical injuries based upon a patient's physical condition, *see Sullivan*, 404 A.2d at 158, and a diagnosis of cerebral thrombosis and hypertension, *see Christensen v. Gammons*, 197 A.2d 450, 453 (D.C.1964). We have not, however, permitted in evidence "psychological" and "psychiatric" diagnoses, such as a diagnosis of PCP intoxication intertwined with a secondary diagnosis of an underlying mental disorder, *see Durant*, 551 A.2d at 1324, and a diagnosis of "psychoneurosis, hysteria, conversion type," *see New York Life*, 79 U.S.App.D.C. at 69, 147 F.2d at 300, or an entry containing a doctor's speculation that thrombosis was the cause of a patient's injury, *see Adkins*, 494 A.2d at 661.

We have no problem deciding that the entries involved in the present case fit within the first group of admissible entries and not the second. Both entries—the notation "alert, oriented X 3" and Hackney's GSC test results—were "[r]egularly recorded facts as to the patient's condition," *id.* at 662 (quoting, *New York Life*, 79 U.S.App.D.C. at 72, 147 F.2d at 303), and not speculative or conjectural diagnoses. Evaluating a patient's degree of conscious awareness is part of the standard neurological work-up of a trauma patient, along with evaluations of the patient's blood pressure, vital signs, and respiratory system. *See* RAYMOND D. ADAMS, MAURICE VICTOR, PRINCIPLES OF NEUROLOGY 281–82, 713–14 4th ed. 1989); TRAUMA 49, 820–21 (Ernest E. Moore et al. eds., 2nd ed.1991). As explained at trial, the notation that Hackney was "alert, oriented X 3" meant that he was alert to "person, place, and time." Hackney's GSC rating, a coma scale rating a person between a high of 15 and a low of 3, provided a second, more formalized, measurement of his degree of alertness. Both are useful standardizations of a patient's neurological condition arrived

at on the basis of examining the physical condition of the patient. *Id.*

The conclusion we arrived at in *Sullivan* bears repeating here:

[I]t is obvious that medical entries as to complainant's condition—his [or her] appearance, physical signs such as pulse, respiration, etc., and the resulting diagnosis— constitute a record admissible under Rule 43–I(a).

*Sullivan*, 404 A.2d at 158. Hackney's level of conscious alertness, like his pulse and respiration, was yet another sign indicative of his condition when he arrived at D.C. General Hospital. The trial court therefore did not err in admitting the two categories of hospital entries under the business records exception.[2]

Clements also contends that the government failed to provide a sufficient explanation for the notation "alert, oriented X 3" and for the GSC rating, and in any event that the explanation of the GSC rating should have been given by the individual who conducted the test. A review of the record reveals that Dr. Perry specifically explained each reference in a way that would be understandable to the jury. Moreover, because we conclude that the medical entries referring to Hackney's alertness qualify under the business records exception, they were admissible without the accompanying testimony of the individuals who conducted the actual tests. *See* Super.Ct.Civ.R. 43–I(a); 5 JOHN H. WIGMORE, EVIDENCE § 1530 at 451–52 (Chadbourn rev.1974); JACK B. WEINSTEIN ET AL., 4 WEINSTEIN'S EVIDENCE ¶ 803(6)[02] (1995).

### III.

We can summarily address Clements' second contention: that statements made by the prosecutor in closing argument constituted prosecutorial misconduct requiring reversal. Clements objects to a statement that "[t]here's not one stitch of evidence that sug-

---

2. We also note that the court in *New York Life* expressly stated that a diagnosis of alcohol intoxication was the type of diagnosis based upon the readily observable condition of the patient that should be admitted in evidence. *See New York Life*, 79 U.S.App.D.C. at 72–73, 147 F.2d at 303–304. While the entries here did not "diagnose" Hackney's sobriety, they did reflect observations about Hackney's condition substantially related to such a diagnosis. The fact that the entries were merely observations, and not diagnoses, only enhanced their reliability, and thus their admissibility under the business records exception.

gests to you ... that blood wasn't drawn before that IV was put in Mr. Hackney," and to statements made by the prosecutor referring to Dr. Lappas, the defense expert.[3] In reviewing a claim of prosecutorial impropriety, we first must determine whether any of the challenged comments by the prosecutor was improper. *See McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991). "Even if we conclude a statement was improper, we will nevertheless affirm the conviction unless the defendant suffered substantial prejudice as a result." *Id.* (quoting *Williams v. United States,* 483 A.2d 292, 297 (D.C.1984), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985)).

■ The statements at issue here were not improper, let alone substantially prejudicial to Clements. The prosecutor's comment that there was no evidence to indicate that blood had not been drawn from Hackney before he was given an IV was intended to challenge Dr. Lappas' testimony that the administration of IVs would have diluted Hackney's blood alcohol level. Despite Clements' contentions on appeal that the statement contradicted an "ambulance report," no records of ambulance personnel were ever admitted in evidence, and it was never established that blood was not drawn from Hackney before he received an IV. The statement was therefore not improper.

■ As for the prosecutor's statements that "that's not the way it works" and "that was not the way it's done," referring to Dr. Lappas' conclusions and methodology, the rule prohibiting lawyers from expressing personal opinions on the veracity of a witness "does not prevent a lawyer from arguing that the testimony of a particular witness should not be believed when the jury could reasonably draw that inference from contradictory evidence in the record." *McGrier,* 597 A.2d at 43.[4] Here, Dr. Lappas' opinion as to Hackney's degree of intoxication was at odds with the testimonies of Dr. Perry, Officer DeFrance, and Officer Woodburn, all of whom testified that Hackney did not appear intoxicated the night he was shot. Finally, the prosecutor's alleged personal attacks on the defense expert came in the context of a general attack on the expert's methodology, and was within the "general nature of argument," *id.* (citations omitted), intended to demonstrate the implausibility of Dr. Lappas' opinion.

*Affirmed.*

---

3. Clements refers to unspecified comments made by the prosecutor criticizing Dr. Lappas' methodology used to reach the conclusion that Hackney had been intoxicated and also to the prosecutor's statement, "that's not the way it works." No objections were made to these statements at trial. Clements also points to the statement, "Is that not the height of arrogance?", which the prosecutor made after reminding the jury that Dr. Lappas had testified that he was aware of Hackney's percentage of body fat although he had never personally seen Hackney.

4. We also note that Clements failed to object to these statements at trial. Where no objection has been made at trial to a prosecutor's remarks, we will not reverse absent a showing of plain error, *i.e.,* error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).