**Vonn WASHINGTON, Appellant,**

v.

**UNITED STATES, Appellee,**

**District of Columbia, Intervenor.**

**No. 00–CF–414.**

District of Columbia Court of Appeals.

Argued June 23, 2003.

Decided May 19, 2005.

Richard K. Gilbert, appointed by the court, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Sidney R. Bixler, Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel at

the time the brief was filed, and Rosalyn Calbert Groce, Supervisory Corporation Counsel, were on the brief, for intervenor.[*]

Before WAGNER, Chief Judge, and GLICKMAN, Associate Judge, and STEADMAN, Senior Judge.[**]

WAGNER, Chief Judge:

Appellant, Vonn Washington, was charged with one count of first-degree premeditated murder (D.C.Code §§ 22–2401, –3202 (1996)),[1] two counts of assault with intent to kill while armed (AWIKWA) (D.C.Code §§ 22–501, –3202 (1996)),[2] three counts of possession of a firearm during a crime of violence (PFCV) (D.C.Code § 22–3404(b) (1996)),[3] and one count of carrying a pistol without a license (CPWL) (D.C.Code § 22–3404(a) (1996)).[4] Following a jury trial, appellant was found not guilty of premeditated murder and AWIKWA, but convicted, respectively, of the lesser-included offenses of involuntary manslaughter while armed and assault with a deadly weapon (ADW). He was also convicted of CPWL and all three counts of PFCV. He argues for reversal on the grounds of: (1) improper and prejudicial prosecutorial argument; (2) exclusion from evidence of a learned treatise; and (3) conviction of CPWL, which he contends is unconstitutional under the Second and Fifth Amendments. Appellant also argues, and the government concedes, that his three PFCV convictions merge. Find-ing no reversible error related to appellant's first three arguments, we affirm the convictions, and we remand to the trial court with instructions to vacate two of the PFCV convictions.

## I.

### A. *Factual Background*

The government presented evidence showing that on July 10, 1996, appellant, intending to shoot Kevin Jackson, shot and killed his best friend, Kenneth Anderson. At about this time, there were two rival groups in the area of Wayne Place, Southeast, and the shooting arose out of a feud between them. Kevin Jackson testified that he associated with a group which included Antonio West and his friends, Aaron and "Poo." Appellant and Anderson were a part of another group. Jackson testified that about a week before Anderson was killed, he was in the area with West, Aaron, Poo and Shawn when shots were fired. Poo and Aaron returned the fire, and Aaron was hit in the leg. Jackson said that his car was torched after the shooting on Wayne Place.

According to Jackson, the night that Anderson was killed, Jackson was at home with his little brother, Poo, Antonio, and others. He went outside to meet a friend, Mike Ko, who parked his Land Cruiser right in front of Jackson's house. Jackson entered the vehicle, and while they were talking, Anderson drove up in a white au-

---

[*] On May 26, 2004, the Office of the Corporation Counsel of the District of Columbia was renamed the Office of the Attorney General of the District of Columbia. *See* Mayor's Order 2004–92, 51 D.C.Reg. 6052 (2004).

[**] Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

**1.** Recodified at D.C.Code §§ 22–2101, –4502 (2001).

**2.** Recodified at D.C.Code §§ 22–401, –4502 (2001).

**3.** Recodified at D.C.Code § 22–5204(b) (2001).

**4.** Recodified at D.C.Code § 22–5204(a) (2001).

tomobile. Appellant was in the front passenger seat. Jackson testified that he saw Anderson and appellant raising their pistols, heard gunshots, ducked and started firing back. Jackson said that the vehicles were only a couple of feet apart and facing in the opposite directions. Jackson testified that he fired his .38 revolver basically out of the window, but Ko, who also had a weapon, did not fire at all. Jackson said that he did not shoot downward because he was firing over Ko's back, and he was afraid of hitting him. Jackson further testified that the Land Cruiser was taller than the car in which Anderson and appellant were sitting, with the top of the smaller car's roof reaching only up to the mirror of the Land Cruiser. The Land Cruiser's driver's side window and front passenger side window were shattered. Jackson said that glass from the vehicle went into his eyes, causing him to believe that he had been shot. After emptying his five-shooter revolver, Jackson and Ko jumped out of the car, ran around the corner, and hid behind a building. According to Jackson, Anderson's car drifted off slowly. Frightened, Jackson and Ko ran back to the house and told the people there that Anderson and appellant had tried to kill them. Jackson testified that he did not call the police because he hoped that those involved would reach an understanding, since they had all grown up together.

Jackson testified that he got rid of the .38 revolver. In searching Jackson's house pursuant to a warrant, the police found a .25 caliber gun, bullets of the same caliber and .9mm ammunition, which he said he had kept because he was told they might fit a .380 weapon that he had owned. Jackson also acknowledged having .45 and Mac–90 shells, although he denied ever having weapons of that make.

Appellant testified that he was not involved in the feud because he considered Jackson and the others to be friends. According to appellant's testimony, the night of the shooting, Anderson asked him to go with him while he attempted to "squash" the differences between the two feuding groups. Anderson was driving his white 1986 Grand Prix, and appellant was in the passenger seat. When they arrived at the corner of 25th and Savannah Street, S.E., they spotted Ko and Jackson. Anderson handed appellant a .9mm Smith & Wesson handgun, and Anderson was armed with a .9mm pistol manufactured by Ruger. Appellant testified that Ko rolled down his window until about four inches remained up, and Anderson started talking to Ko and Jackson. He said that he saw a burgundy Jetta automobile behind the car, and turned the rearview mirror toward him to the point that Anderson could not use it.[5] Appellant testified that Aaron and "Pooh" got out of the Jetta, and he told Anderson to pull off. According to appellant, shots were fired, and he returned the fire. Appellant testified that he had turned his upper body to the left, where the Land Cruiser was, and shot out "through the back" of that vehicle. When he told Anderson to drive away, he realized that the car was "coasting." He saw Anderson "slumped over," with blood coming from the back of his head. While still in the passenger's seat, appellant drove the car to Southeast Community Hospital. He described how he was trying to hold Anderson's head up while driving. Appellant parked the car at the hospital and ran away, leaving his friend in the vehicle.

Appellant testified that he did not call police. Six or seven days after the shooting, however, he was contacted by prosecutors and eventually spoke to them. He

---

5. Both Ko and Jackson denied seeing a burgundy Jetta in the area.

testified before the jury that he told the prosecutors that he had a .357 revolver because he knew that the .9mm would leave shell casings in the car, whereas the .357 would not. He also told the prosecutors that he was not in the car and did not see anything.

## B. *Forensic Evidence*

Dr. Jacqueline Lee, deputy chief medical examiner for the District, who qualified as an expert in forensic pathology, testified that Anderson's death was a homicide caused by a gunshot wound to the head. A .9mm Luger, Winchester Western, silver-tipped, metal jacket bullet and fragments were recovered from Anderson's brain. Based on Dr. Lee's review of the autopsy, she concluded that the bullet had a "very tight spin," meaning that it was unlikely that it made contact with any object before hitting Anderson in the head. She testified that the trajectory of the bullet was upward, traveling from the back to the front of the head and upward. She testified that the circumstances were consistent with a shot fired by the passenger (appellant) and hitting the driver, Anderson, if the driver was looking out of the window.

Dr. Lee testified that the photograph of the decedent and autopsy report show an absence of stippling which could indicate that the muzzle of the gun was twenty to twenty-four inches away from the body, or that it was closer and something blocked the gunpowder from being deposited.[6] She indicated that her estimates were based on the type of gun powder, as well as the type of gun and that the distance at which stippling would occur depends upon several variables, such as the type of gun, type of gun powder, and length of the gun. She said that hair around the wound would impact the presence of gun powder and that any soot could have been washed away when Anderson's wound was cleaned at the hospital. However, she stated that while soot can be washed away, stippling cannot because it is a burn to the skin. Dr. Lee acknowledged that although hair can affect the amount of visible stippling, Anderson had closely cropped hair, making the scalp visible at some points. Dr. Lee testified that the decedent's wound was not consistent with the bullet passing through a door panel of a car or glass because the bullet would have been deformed.

Mr. Leon Krebs, who qualified as an expert on gunshot residue, firearms and ammunition identification, and trajectory analysis, testified that the .9mm cartridges in question are loaded with disk or flake powder. He stated that in the case of flake powder, stippling would occur if the muzzle of the gun was within twelve inches of the victim's skin. Krebs also testified that Anderson's wound was consistent with a shot being fired from the passenger seat of the car striking the driver in the head. Krebs testified that, considering that the .9mm silver-tipped bullet in this case was propelled by flake or disk powder, one would expect to see stippling only if the gun had been fired within a distance of twelve inches of the decedent. Krebs testified that since the decedent's wound had a fairly round margin of abrasion, it was most likely caused by an intact bullet passing through the skin. He testified that a regular or circular wound and the lodging of the core and jacket of the bullet inside the decedent's brain, as the evidence

---

**6.** Dr. Lee explained that:

> [s]tippling is the term used to help us indicate the distance the ... muzzle of the gun is from the skin when a bullet is fired. Stippling is caused by unburned or partially burnt particles of gun powder making contact with the skin in either burning the skin or because of the impact splitting off the top layer of skin, so there are little abrasions to the skin ....

showed in this case, indicates that the bullet had not passed through any intermediate targets before striking the victim.[7]

## II.

Appellant argues that the prosecutor's closing argument was improper and prejudicial in that it: (1) appealed to the sympathy of the jury, and (2) included facts not in evidence. The government responds that the challenged argument was based properly on the evidence or reasonable inferences therefrom. The government contends that, in any event, appellant was not prejudiced by the argument.

### A. Legal Standard

When reviewing claims of improper prosecutorial argument, we determine first whether the challenged argument is improper. *Burgess v. United States*, 786 A.2d 561, 570–71 (D.C.2001) (internal citation omitted), *cert. denied*, 537 U.S. 854, 123 S.Ct. 210, 154 L.Ed.2d 88 (2002). If appellant has made a timely objection to the argument, then we must determine whether the court's error, if any, in overruling the objection was harmless under the standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Clayborne v. United States*, 751 A.2d 956, 968 (D.C.2000). Under that standard, we consider whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[.]" *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239. In making that determination, we "consider the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and

the strength of the government's case." *Burgess*, 786 A.2d at 570 (citations and internal quotations omitted). If appellant did not object, then our review is for plain error. *Id.* (citing *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991)). Under that standard, this court will reverse only if the defendant's substantial rights were so clearly prejudiced as to jeopardize the fairness of the trial. *Hunter v. United States*, 606 A.2d 139, 144 (D.C.1992) (citations omitted).

### B. Argument Concerning Julia Lane

The government presented the testimony of Julia Lane, who lived in the area of the shooting. Ms. Lane testified that she was at home on the night of the shooting with her sixteen-month old son, when she heard a loud crash that sounded like a breaking dish. The next morning she saw broken glass and a hole in the window shade that she thought to be a bullet hole. Ms. Lane called the police who came and found a bullet near her son's high chair. Over defense objection, the trial court precluded any general reference to what might have happened to Ms. Lane and her child, but ruled that the prosecutor could use the incident to illustrate transferred intent as the prosecutor had requested. The prosecutor then argued that "[appellant] would have been just as guilty of shooting someone in Julia Lane's apartment as he ... is guilty of shooting at and trying to kill Kevin Jackson and Michael Ko. He's also guilty of the murder of his best friend, Kenny Anderson." Appellant argues that permitting this argument was error because: (1) it appealed to the passions and prejudice of the jury; (2) it was not necessary for an explanation of the concept of transferred intent; and (3) it

---

7. Additional facts related to the parties' contentions appear in the discussion of their related arguments.

implicitly asked the jury to convict despite appellant's self-defense claim because there was no evidence of self-defense related to "the hypothetical shooting of Ms. Lane or her son."

■ A prosecutor should refrain from making statements that are designed to inflame the passions of the jury. *See Butts v. United States,* 822 A.2d 407, 420 (D.C.2003) (citing *Nelson v. United States,* 601 A.2d 582, 587–88 (D.C.1991)). To that end, prosecutors are prohibited from making statements that "attempt to appeal to the jurors' sympathies[.]" *Carpenter v. United States,* 635 A.2d 1289, 1296 (D.C. 1993). Prosecutorial remarks that urge the jury to render a verdict based upon the larger social policy implications of the crime are improper. *See Hart v. United States,* 538 A.2d 1146, 1150 (D.C.1988) (finding improper the prosecutor's argument to find defendant guilty "for everything [he] did" was improper, as it asked jurors to render a verdict based upon a larger societal policy).

■ The argument calling the jury's attention to appellant's actions that placed Ms. Lane and her infant son in harm's way tends to arouse the passions of the jury. Viewed in context, the reference to Ms. Lane's apartment was a fleeting, even if an unnecessary, effort to explain the concept of transferred intent. The main focus of the prosecutor's transferred intent [8] explanation was upon the person appellant intended shoot, Jackson, and the actual victim, Kenny Anderson. However, this hypothetical "example in argument," as the trial court described it, picked up on a questionable theme of the prosecutor's opening statement, to which appellant had objected, that Ms. Lane was one of appellant's "unintended victims." These references were more likely to evoke an emotional reaction and deflect the jury from its task than they were to elucidate the concept of transferred intent. Nevertheless, given the brevity of the prosecutor's remarks, their context, and the strength of the government's case, we are persuaded that any error of the trial court in not taking corrective action was harmless.

### C. The Rear View Mirror and Veracity Arguments [9]

■ Appellant argues that the prosecutor engaged in improper rebuttal argu-

---

**8.** The relevant portion of the argument proceeded as follows:

When you think about the evidence in this case, remember also that the whole idea of intent in this case deals with transferred intent. Okay. Because nobody is saying that the defendant intended to kill his best friend, Kenny Anderson. That was a mistake. He intended to kill Kevin Jackson. Intended to shoot at Kevin Jackson and Michael Ko. The intent transfers, the intent to shoot at these men or just Kevin Jackson transfers. So that he is guilty of the intent that . . . is needed in order to show that he is guilty of the murder of Kenny Anderson. When you think about transferred intent, remember Julia Lane. Remember what it's all about. Julia Lane is right over here. The transferred intent theory is in place because it's trying to show that people are just as guilty of shooting and injuring some-

one they didn't intend to shoot as they are of someone they intended to shoot. He would have been just as guilty of shooting someone in Julia Lane's apartment as he

----

[Defense Counsel]: Objection, speculation.

[The Court]: Overruled. It's an example in argument.

[Prosecutor]: Just as he is guilty of shooting at and trying to kill Kevin Jackson and Michael Ko. He's also guilty of the murder of his best friend, Kenny Anderson. Thank you.

**9.** We address these arguments under the same subsection because they occurred close together. Appellant contends that the issues are so intertwined that preservation of one by objection preserves the objection for the other. There may be circumstances where raising one issue fairly notifies the trial court of

ment by: (1) misstating evidence concerning whether the position of the rear view mirror in the vehicle that appellant was driving had been moved; (2) guaranteeing that, contrary to appellant's testimony, the rear view mirror had not been moved; and (3) urging the jury to conclude from these circumstances that appellant was not telling the truth when he said he was watching Aaron and "Poo" through the mirror. He contends that the argument was improper because it was not based on the evidence, suggested essentially that appellant was lying, and expressed the prosecutor's personal opinion.

 Several principles guide our disposition of these arguments. First, a prosecutor may comment on the evidence presented and make reasonable inferences based thereon. *Tuckson v. United States*, 364 A.2d 138, 142 (D.C.1976) (citing *Mallory v. United States*, 178 A.2d 918, 919 (D.C.1962)). However, " '[i]t is improper for an attorney to make an argument to the jury based on facts not in evidence and not reasonably inferable from the evidence.' " *Russell v. United States*, 701 A.2d 1093, 1099 (D.C.1997) (quoting *Morrison v. United States*, 547 A.2d 996, 999 (D.C.1988)). Second, what constitutes an improper comment on the credibility of a testifying witness is sometimes difficult to discern, but such comments "will be within the acceptable range as long as it is in the general nature of argument, and not an *outright* expression of opinion." *Irick v. United States*, 565 A.2d 26, 36 (D.C.1989) (citing *Logan v. United States*, 489 A.2d 485, 490–91 (D.C.1985) (other citations omitted; emphasis in original)). "[T]he key inquiry is whether the attorney is commenting on the evidence, which he may do, or expressing a personal opinion, which is taboo." *Id.* at 36. With these principles in mind, we consider each of appellant's challenges to the argument.

### (1) Rear View Mirror Argument

In closing argument, the prosecutor argued that, contrary to appellant's version of events, the mirror was never touched while appellant drove his friend to the hospital after he was shot, and he "guaranteed" that appellant had not touched it.[10]

---

additional issues. *See Ford v. Georgia*, 498 U.S. 411, 418, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *Trevino v. Texas*, 503 U.S. 562, 567, 568, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992). However, "we have long applied the rule that '[q]uestions not properly raised and preserved during the proceedings under examination, *and points not asserted with sufficient precision to indicate distinctly the party's thesis*, will normally be spurned on appeal.' " *Card v. United States*, 776 A.2d 581, 587 (D.C.2001) (quoting *Womack v. United States*, 673 A.2d 603, 612 (D.C.1996)) (other citations omitted; emphasis and alteration in original). Therefore, we consider the preservation issue applying this longstanding rule.

10. The argument proceeded as follows:
[T]here's one thing out there that's going to prove [Washington]'s telling you something that ain't the truth. Certain things don't lie. People can come in here and lie. Evidence doesn't lie. Remember back when Mr. Washington said [what] he was doing just before the shooting. He was seated in the car, worried about Aaron and Pooh. That's what he says, right. Of course, Casey and—Casey Dunmore and Kevin Jackson tell you Pooh is not out there. Defendant told you I changed the rear view mirror. I looked in that rearview mirror to look back....
[H]e's holding him like this and driving, driving, driving. Get to the hospital. I get there; I stop. The guard comes out. I get out and run away. You know what, that is all not the truth. How do you know that? The rear view mirror. Never been touched. In the spot where Kenny Anderson had it when he was shot in the head, where he had it when he got in the car that day.
[Defense Counsel]: Objection.
[Prosecutor]: Never been moved.
[The Court]: Overruled. It's argument.
[Prosecutor]: Not in a position where Vonn Washington can see back. It's where the

Appellant contends that the record does not support the inference that the mirror had not been moved, while the government contends that it was a fair inference from the testimony and a photograph of the vehicle taken after appellant hurriedly left the decedent at the hospital, which showed the rear view mirror in its customary position.

▬▬▬▬ Appellant testified that before the shooting, he had moved the mirror so far towards the passenger seat where he was seated that the driver, Anderson, could not see what was going on behind him. Appellant then described a fast developing scene during which he warned Anderson of the approach of Aaron and "Pooh" from the rear, which he was observing through the rearview mirror. He testified that shots rang out, and then he and Anderson pulled their weapons. He testified that the car swerved, and Anderson slumped over the wheel, requiring appellant to grab the wheel and drive to the hospital, while trying to hold Anderson up. The evidence showed that appellant got out of the vehicle and immediately ran away. The government argues, persuasively, that in order to credit appellant's version of the events, the mirror had to be placed back into its customary position between the time appellant used it to observe Aaron and Poo approaching from the rear and the time that he arrived at the hospital where he left his mortally wounded friend. This evidence, along with evidence that the mirror was in

its customary position when photographed at the hospital by the crime scene officers, is sufficient to permit a reasonable inference that no opportunity was shown when appellant could have moved the mirror back to its customary position, and therefore, it had not been turned toward appellant as he described. The prosecutor is permitted to argue reasonable inferences from the evidence. *Streater v. United States,* 478 A.2d 1055, 1059 (D.C.1984) (citing *Tuckson, supra,* 364 A.2d at 142) (other citation omitted). It does not appear that the prosecutor treaded into the area of impermissible speculation with this argument. *See Clayborne, supra,* 751 A.2d at 969 (citation omitted). The argument had a basis in the evidence and reasonable inferences from it. Therefore, we find no abuse of discretion in the trial court's decision to permit the argument over appellant's objection.

### (2) *Guarantee Language*

Appellant also contends that by using the word, "guarantee," the prosecutor improperly injected his personal opinion and implied that he had personal knowledge of the events he was summarizing. The government contends that the statement is not an outright expression of opinion and did not suggest any personal knowledge. The government concedes that such phrases as "I guarantee" should be avoided because of their potential for confusion. It contends, however, that the prosecutor was not expressing a personal opinion or

driver of that car would have the rear-view mirror. Everything he told you about Aaron and Pooh being out there that day, is not the truth. And Exhibit 65 proves that to you. That mirror has never been touched. [Defense Counsel]: Objection.
[The Court]: Overruled. He doesn't know about whether it's touched but -
[Prosecutor]: It may have been touched before. I guarantee who didn't touch it

was Vonn Washington that night. Vonn Washington didn't move that mirror. Why is that important? Because that proves to you that Aaron and Pooh weren't out there. Vonn Washington wasn't looking backwards. His entire house of cards comes tumbling down with all the other things he told you up there that weren't the truth, but this is one he can't get away from.

indicating that he had personal knowledge of the events when he used this language.

 As stated previously, "the key inquiry is whether the attorney is commenting on the evidence, which he may do, or expressing a personal opinion, which is taboo." *Irick, supra*, 565 A.2d at 36. We agree that the comment here was not an outright expression of opinion. In context, the language appears to have been used for emphasis in making arguments based on the evidence. As such, it remained within an acceptable range of argument. *See id.* ("A comment will be within the acceptable range as long as it is in the general nature of argument and not an *outright* expression of opinion.") (citing *Logan, supra*, 489 A.2d at 490–91 (other citation omitted) (emphasis in original)).[11] Therefore, we find no error, and clearly no plain error.[12]

 Washington also contends that the prosecutor improperly indicated that he was not telling the truth by using phrases such as, "that is all not the truth," "[e]verything he told you about Aaron and Poo being out there that day, is not the truth," and "his entire house of cards comes tumbling down with all the other things he told you up there that weren't the truth, but this is one he can't get away from."

 "[C]haracterizing testimony as incredible is an accepted and proper form of comment on contradictory testimony" so long as that characterization has an evidentiary basis. *See Irick, supra*, 565 A.2d

at 35 (citing *Dyson v. United States*, 418 A.2d 127, 130 (D.C.1980)). Here, the prosecutor's comments were based upon logical inferences from the evidence. The prosecutor was asking the jury to conclude that Aaron and Poo had not been out there that day, as some witnesses testified, and therefore appellant was not forthcoming about the events. The prosecutor made his point using facts and inferences from the evidence, including the testimony of Jackson and Exhibit 65.

### (3) "House of Cards" Argument

 Finally, appellant contends that the prosecutor erred in referring to his testimony as a "house of cards" that had come tumbling down, and otherwise commenting on his veracity, since the references implied that Washington was lying. Again, the government argues that these statements were fair comments on the evidence. Specifically, the government notes that appellant admitted that he had not been forthcoming initially about his role in the offense, and that defense counsel so stated in closing argument. Therefore, the government contends that it was justified in commenting on Washington's veracity. The government additionally argues that even if the remark were improper, no prejudice flowed from it, as defense counsel used "equally explicit language" in attacking the government's witnesses.

 This argument was a fair argument on appellant's credibility based on

---

**11.** *See* note 10, *supra*, for quotations from this argument.

**12.** Appellant seems to argue that since he objected to that part of the argument concerning the rear view mirror, the objection to the guarantee language was preserved. However, appellant did not raise any objection to the words used, which come after his objection. His objection focused specifically upon the argument related to the position of the rear

view mirror. Absent any objection to the use of the words, it cannot be said that the defense fairly apprised the court of the fact that he took issue with the language. *See Hunter, supra*, 606 A.2d at 144 (Objections must be sufficiently specific to fairly apprise the court of the issue upon which it is being asked to rule to preserve the objection.) Absent preservation of the objection, we review for plain error (citations omitted).

the evidence. Counsel is not precluded "from arguing that the testimony of a particular witness should not be believed when the jury could reasonably draw that inference from contradictory evidence in the record[.]" *McGrier, supra,* 597 A.2d at 43. In this case, appellant admitted in testimony that he did not tell the truth initially about his involvement in the shooting. Although we have condemned assertions by counsel that a witness lied on the witness stand, "saying that a witness' testimony is incredible is permissible when that is a logical inference from the evidence and not merely the opinion of counsel." *Id.* (citing *Irick, supra,* 565 A.2d at 35). The "house of cards" formulation was fair comment, given the many bases in the evidence to challenge appellant's credibility.

### III.

Appellant argues that the trial court abused its discretion by precluding defense counsel from reading to the jury from a learned treatise, which the government's firearms expert had acknowledged was an authoritative source.[13] He contends that he complied with the foundational requirements for admission of the evidence under FED. R. EVID. 803(18), which he urges this court to adopt, if it is not already applicable. The government responds that the

trial court properly precluded admission of this evidence because appellant failed to confront the expert witness with the particular passages that he sought to present to the jury.

### A. *Factual Background*

Before the defense rested its case, defense counsel sought to read into evidence, but not send back to the jury, statements from a treatise entitled GUNSHOT WOUNDS by Vincent Dimaio. Mr. Leon Krebs, who testified as an expert witness on gunshot residue, firearms and ammunition identification, and trajectory analysis, had acknowledged during testimony that he had reviewed this treatise and that it was an authoritative source.[14] During cross-examination, defense counsel did not confront the witness with a particular passage from the book. However, he contends that he adequately met the foundational requirements of FED. R. EVID. 803(18) by calling the witness' attention to specific studies done with .38 and .22 caliber ammunition that were published in the Dimaio treatise, eliciting some of the results, and having the witness confirm that he knew of no other scientific studies that had produced different results. Pertinent portions of the testimony appear in the margin.[15] Before the defense rested, counsel

13. Appellant concedes that this issue relates only to the involuntary manslaughter while armed count and related possession of a firearm during the commission of a crime of violence.

14. During questioning by the prosecutor, Mr. Krebs acknowledged familiarity with Dimaio's book, GUNSHOT WOUNDS, and that it was an authoritative source. Subsequently, defense counsel inquired of the witness about the book as follows:

Q. Have you also read various books and manuals concerning gunshot wounds?
A. Yes, two manuals that address that very complexly and completely are Dr. Dimaio's

book, GUNSHOT WOUNDS, and also ... Dr. Werner Spitz's book [...,] MEDICAL/LEGAL INVESTIGATION OF DEATH. Both gentlemen address wound configurations in great detail.
Q. Have you had a chance to read those texts or portions of those texts in the past?
A. Yes, I have._____

15. Mr. Krebs acknowledged testifying in an earlier proceeding that one would find stippling (powder tattooing) out to at least eighteen inches from the weapon fired. Additional testimony by defense counsel of the witness relevant to the present evidentiary issue developed as follows:

Q. ... [I]s there something that has caused you to change your opinion?

requested the court's permission to read to the jury from the Dimaio treatise, citing as authority FED. R. EVID. 803(18). The government objected, stating that Rule 803(18) permits the introduction of treatises to the extent called to the attention of an expert. The court precluded admission of the evidence, noting that although the treatise had been called to the witness' attention, its meaning would have to be at least the subject of direct or cross-examination of the expert. The court also observed by way of example that "you can't just call a witness to say this [is] in the Encyclopedia Britannica and it's [a] well-recognized authority in its field and then go pick anything out of the encyclopedia." Appellant argues that the court erred in its ruling and that he was prejudiced thereby.[16]

A. Initially when I was asked that question back in January, it was a general inquiry and there was no indication of the type of powder. And considering that 12 to 24 inches was a medium range of fire, I incorporated both flake and ball powder and crushed ball powder into my estimate when I gave the answer of 18 inches.

* * * *

Q. ... So when we're using the range of 12 to 24 inches, what you're saying beyond 24 inches you would not expect to see powder tattooing?

A. Beyond 24 inches, even beyond possibly 18 inches, or at contact . . . .

However, as the gun muzzle moves away from the skull in distance, there comes a point when tattooing can no longer occur, either because of the distance that the muzzle is from the victim's scalp or the density of hair which can interfere with the travel or flight of powder as the gun is fired.

Q. ... [W]ith respect to calculating approximate distances, that's a result of tests that have been performed in the field; is that correct?

A. That's correct.

* * * *

Q. And so there are studies in the field as to what you would expect for different kinds of powder with respect to tattooing; is that right?

A. That's correct.

Q. Now, one of those studies is in the text ... that you referred to, that is, Dimaio GUNSHOT WOUNDS; right?

A. There are studies in Dimaio's book and also a study in the Warren Spitz book.

Q. With respect to Dimaio's study, first of all, they found that with a .38 special that you could expect to find powder tattooing out to 60 centimeters; right?

A. That's correct[.]

Q. That [is] 24 inches?

A. That's correct.

* * * *

Q. And that also happened, powder tattooing, with flaked powder out to about 60 centimeters; right?

A. That's correct.

* * * *

Q. So are you aware of other studies that would produce different results than the study reported by Dimaio?

A. Dr. Spitz came up with a different opinion as with regards to distance, and tests that I have conducted using tissue and hair, I come up with distances that slightly differ from Dimaio but well within his ranges, as well as Dr. Spitz's ranges.

Q. ... Is there a particular reference source that you're referring to [for the book edited by Dr. Spitz]?

A. Yes, the book edited by Dr. Spitz which is entitled the MEDICAL/LEGAL INVESTIGATION OF DEATH.

Q. ... [A]re you aware as to whether or not that source actually lists the results of a particular study the way that Dr. Dimaio did?

A. No, it does not.

Q. ... Are you aware personally, leave your own studies and experience aside for just [a] moment, are you aware of any scientifically-conducted study that would produce—that did produce results different than Dr. Dimaio?

A. No.

16. Appellant sought to show from the Dimaio treatise that stippling from ball powder can occur out to three feet, a greater distance than the twelve inches or less that the government's expert, Mr. Krebs, testified to on direct and greater than the estimate of eighteen inches that he gave at appellant's first trial. In explaining his earlier estimate, Mr. Krebs explained that he "incorporated both flake and ball and crushed ball powder" into his

B. *Applicable Legal Principles*

 The decision to admit or exclude evidence is committed to the trial court's discretion. *See Plummer v. United States*, 813 A.2d 182, 188 (D.C.2002) (citing *Mercer v. United States*, 724 A.2d 1176, 1182 (D.C.1999)). Thus, we review its evidentiary rulings for an abuse of discretion. *Id.* In determining whether the trial court has abused its discretion in making an evidentiary ruling, we consider "whether the exercise of discretion was in error and, if so[,] whether the impact of that error requires reversal." *(James W.) Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979).

 Federal Rule of Evidence 803(18) governs the admission of learned treatises as an exception to the hearsay rule in the federal courts. *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 465 (5th Cir.1985). Rule 803(18) permits the use of learned treatises as substantive evidence " 'to the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination ...,' as long as it is established that such literature is authoritative."[17] *Tart v. McGann*, 697 F.2d 75, 78 (2d Cir.1982) (quoting Rule 803(18)). The court explained, however, that the Advisory Committee to the rules had rejected admission of such evidence

independent of the expert's testimony, and thus, "the Rule permits the admission of learned treatises as substantive evidence, but only when 'an expert is on the stand and available to explain and assist in the application of the treatise ....' " *Id.* (citing FED. R. EVID. 803(18) advisory committee note). Additional references in the Advisory Committee's note indicate that the intention was to permit the use of the treatise in connection with cross-examination. In that regard, the Note states, "[t]he greatest liberality is found in decisions allowing use of the treatise on cross-examination, when its status as an authority is established by any means .... [Rule 803(18)] is hinged upon this last position ...." *Allen v. Safeco Ins. Co. of America*, 782 F.2d 1517, 1520 (11th Cir.1986) (quoting FED. R. EVID. 803(18) advisory committee note) (alterations in original). The reason for the rule is to avoid jury misunderstanding and misapplication of technical information in the treatise or article that might occur if the jury were permitted to consider the publication itself "instead of receiving the information through the testimony of an expert in the field." *Dartez, supra*, 765 F.2d at 465 (citation omitted).

 Although this court has adopted some of the Federal Rules of Evidence,[18] it

---

earlier estimate. Appellant contends that the information from the treatise was important to his case because no stippling was found around the decedent's wound, and the government contended that appellant shot the victim in the close confines of the front seat of a car.

17. Under FED. R. EVID. 803(18), the following is listed as an exception to the hearsay rule:
 To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable au-

thority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.
 FED. R. EVID. 803(18).

18. *See, e.g., (William) Johnson v. United States*, 683 A.2d 1087, 1090 (D.C.1996) (en banc) (adopting policy of FED. R. EVID. 403 ("evidence [otherwise relevant] may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice")); *Laumer v. United States*, 409 A.2d 190, 192 (D.C.1979) (en banc) (adopting FED. R. EVID. 804(b)(3) statements against penal interest). "While the decisional law of the

has not formally adopted Rule 803(18). However, this court has cited the rule as authority, in part, for rejecting summarily an argument that the trial court erred in refusing to admit into evidence two medical journal articles to impeach the testimony of a defendant physician. *See Quin v. George Wash. Univ.*, 407 A.2d 580, 581 (D.C.1979). In *Quin*, a wrongful death and survival action based on medical negligence, both of the decedent's surgeons had testified to several medical journal articles in support of their opinions on causation.[19] *Id.* at 581–82. We concluded that there was no error in excluding the articles, which had been used extensively on re-direct and re-cross, citing "2 JONES ON EVIDENCE § 12.31 (1972) ('the prevailing view of the courts is that books or treatises which deal with [medicine, surgery, and mechanics] are barred by the rule against hearsay as evidence of facts or opinions stated therein, no general exception having been developed to make them admissible')[.]" *Id.* at 581 n. 3. This court has also cited Rule 803(18) with a parenthetical reference to that portion of the rule that provides that "statements contained in learned treatises may be read into evidence but may not be received as exhibit[s]." *Id.* Thus, as one commentator noted, the federal rule "appears consistent with D.C. law and practice." GRAAE & FITZPATRICK, THE LAW OF EVIDENCE IN THE DISTRICT OF COLUMBIA, 8–112 (2002). We agree. Therefore, we consider the argument raised by appellant applying FED. R. EVID. 803(18).

### C. Analysis

Appellant acknowledges that he did not confront the expert witness, Mr. Krebs, with the specific passages he sought to read from the Dimaio book. However, he urges this court to conclude that confrontation of the expert with the specific language a party seeks to have admitted under the rule is not required. The government argues that there is no authority supporting appellant's argument and that case precedents adhere to an interpretation to the contrary.

 The plain language of Rule 803(18) and the principles previously outlined tend to support the interpretation advanced by the government. The rule states explicitly, "[t]o the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, *statements* contained in published treatises ... [are not hearsay]." FED. R. EVID. 803(18) (emphasis added). Thus, the admissibility of the subject "statements" is dependent upon meeting one of the requirements expressed in the disjunctive in the rule. Like the rule for statutory construction, "words of a [rule] should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Thompson v. District of Columbia*, 863 A.2d 814, 817–18 (D.C.2004) (citation and internal quotations omitted). This language plainly shows that to qualify for admission under the rule, it is the particular "statement[ ] contained in the treatise[ ]" that must be called to the attention of the expert. FED. R. EVID.

federal courts interpreting various rules of evidence often provide guidance, this court is the final authority for establishing the evidentiary rules for the Superior Court of the District of Columbia." *Id.* at 195 n. 7.

19. The factual details concerning the foundation laid for offering the journal articles into evidence cannot be gleaned from the opinion, no doubt because it was not the principal argument raised on appeal. *See Quin, supra,* 407 A.2d at 581 (indicating that the principal argument on appeal related to the trial court's failure to instruct the jury on *res ipsa loquitur*).

803(18). Federal courts have so interpreted the rule. *See, e.g., Tart, supra,* 697 F.2d at 78 (Rule 803(18) "permits the admission of learned treatises as substantive evidence, but only when 'an expert is on the stand and available to explain and assist in the application of the treatise .... ' ") (citation and internal quotations omitted); *United States v. McQuiston,* 998 F.2d 627, 629 (8th Cir.1993) (The court did not abuse its discretion in rejecting a proffered periodical article not offered in connection with any witness' testimony.). Some states with a similar evidentiary rule have concluded likewise that the expert's attention must be directed not just to the treatise, but to the particular statement in the treatise sought to be placed before the jury.[20] Thus, these state decisions are consistent with the purpose of the federal rule, which is to avoid jury confusion by prohibiting the introduction of treatise material without expert interpretation. FED. R. EVID. 803(18) (advisory committee to ¶ 18). If the expert's attention is not drawn to the specific material while on the stand, the material could be read to the jury without the benefit of expert guidance. Under the interpretation of the rule that appellant advances, the mere mention of a treatise by the expert would be sufficient to justify reading it later during the trial. However, it has been noted that such a "hide-the-ball" approach is disfavored. Mueller & Kirkpatrick, EVIDENCE § 8.60, at 1263 (1995).[21] Requiring speci-

ficity assists the jury and protects the integrity of the adversarial process. *Id.*

▮▮▮ Appellant contends that he sufficiently met the requirements for admissibility by having the expert witness acknowledge the book as authoritative and by eliciting from him that he knew of no other scientific studies that produced different results for .38 and .22 ammunition than those appearing in the Dimaio book. The question is whether defense counsel's questioning was sufficient to call the witness' attention to the specific portion of the treatise that he sought to call to the jury's attention. Appellant did question Mr. Krebs about the Dimaio book, and he addressed during cross-examination some part of it. We recognize that cross-examination can be sufficient to meet the attention-calling requirement. EVIDENCE, *supra,* § 8.60 at 1263. However, a passing reference is insufficient, and "if [counsel] plans to make substantive use of the material by reading from it and arguing that it proves what it says, [counsel] has to ask the expert to explain the passages and relate them to what he conveys in his testimony." *Id.*

▮▮▮ In the present case, the attention-calling requirement was not adequate to permit admission of the material as substantive evidence. Here, counsel did not call the expert's attention to the pages of the Dimaio book from which he sought to read, apparently pages 113–114.[22] Al-

**20.** *See, e.g., Echols v. State,* 326 Ark. 917, 936 S.W.2d 509, 530 (1996) (identical to federal rule in relevant part; noting that the rule applies "to a particular statement from a treatise"); *Commonwealth v. Sneed,* 413 Mass. 387, 597 N.E.2d 1346, 1351 & n. 6 (1992) (accepting proposed rule, identical to FED. R. EVID. 803(18), as relevant here, and requiring opponent to "bring to the witness's attention a specific statement in a treatise").

**21.** The Mueller & Kirpatrick book explains:

The thing to prevent is the hide-the-ball approach in which the proponent makes passing reference to the book or article (avoiding any real exchange with the expert) and trots it out later when the expert has left, either in argument or a read-to-the-jury speech or by using a surrogate witness who cannot provide perspective.

*Id.* at 1263.

**22.** Appellant's brief identifies these pages.

though some of defense counsel's questioning was based on information that appears in the book, it is not clear that Mr. Krebs' responses were based on the specific pages of the treatise defense counsel wanted to read. Appellant did not elicit the expert's interpretation of that portion of the treatise prior to seeking to read it to the jury. The failure to ask the expert specifically about the particular portion of the treatise deprived the witness of the opportunity to explain, counter or interpret those particular passages concerning distances that defense counsel wanted to present to the jury. Mr. Krebs testified that tests that he conducted and a book edited by a Dr. Spitz differed slightly from Dimaio on distances, but were well within his ranges. Since Mr. Krebs' attention was not called to the part of the book that counsel asserts differs from Mr. Krebs' opinion, Krebs had no opportunity to reconcile or explain any differences and their significance, if any, to the issue or to identify other portions of the text that might have been relevant to his position. For these reasons, we conclude that the trial court did not abuse its discretion in concluding that the examination was not sufficiently specific to meet the foundational requirement for reading the portions of the treatises offered as proof of the matter asserted.[23]

## IV.

Appellant argues for the first time on appeal that his convictions of carrying a pistol without a license should be vacated on constitutional grounds. Specifically, he contends that the statute under which he was convicted, D.C.Code § 22–3204(a) (1981) (recodified as D.C.Code § 22–4504(a) (2001)) unconstitutionally infringes upon his rights under the Second Amendment to bear arms and his due process rights under the Fifth Amendment. He contends that the District's licensing statute constricts too narrowly the class of citizens to whom a license is available and is unconstitutionally vague. The government argues that appellant waived these arguments because he did not raise them in the trial court and they fail on the merits, in any event.[24]

■■ Appellant concedes that he did not challenge the constitutionality of the CPWL statute in the trial court. We have rejected as waived such belated constitutional challenges. *See Hager v. United States*, 856 A.2d 1143, 1151 (D.C.2004) (citing *Mitchell v. United States*, 746 A.2d

23. Even assuming arguendo that the trial court abused its discretion in this evidentiary ruling, any error in producing additional evidence of the absence of stippling was harmless. First, both Dr. Lee and Mr. Krebs testified that the absence of stippling could be attributable not only to distance, but also to other factors. Second, appellant admitted that he fired his weapon, and the forensic and ballistic studies indicate that the trajectory would have been consistent with his position in the car. Although appellant notes that it was also consistent with a shot by Jackson under certain circumstances, more evidence points to the shot by appellant. The bullet was described by the experts as having a "tight spin," meaning that it did not hit an intervening target. A shot by Jackson likely would have had to pass through the glass window of the Land Cruiser—which was shattered—thus preventing a tight spin, according to the testimony. Therefore, the additional evidence about stippling that appellant sought to offer was unlikely to influence the outcome of the trial, and any error was harmless. *See Kotteakos, supra,* 328 U.S. at 764–65, 66 S.Ct. 1239 (If we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is harmless).

24. The District appeared in the case to address this issue, taking the position that appellant cannot prevail on his constitutional challenge under binding precedent.

877, 885 n. 11 (D.C.2000)). Even if we were to review for plain error,[25] appellant cannot prevail because his arguments are foreclosed by this court's binding precedents.[26] *See Sandidge v. United States,* 520 A.2d 1057, 1058 (D.C.1987) (holding that D.C.Code §§ 6-2311, 6-2361 and 22-3204 (1981) (CPWL statute) do not violate the Second Amendment); *see also Hager,* 856 A.2d at 1151 (noting Second and Fifth Amendment challenges foreclosed by *Sandidge* and *Austin v. United States,* 847 A.2d 391, 393 (D.C.2004) (rejecting due process challenge)).

## V.

Finally, appellant argues that his three convictions of PFCV merge because they result from a single act of violence during which there was possession of a single weapon. The government concedes that in light of *Nixon v. United States,* 730 A.2d 145, 153 (D.C.1999), appellant can stand convicted of only a single count of PFCV. We agree.

For the foregoing reasons, we affirm the judgment of the trial court and remand with instructions for the court to vacate two of the convictions of PFCV.

*So ordered.*

25. We will reverse for plain error "only in an extreme situation in which the defendant's substantial rights were so clearly prejudiced that the very fairness and integrity of the trial was jeopardized." *Hunter, supra,* 606 A.2d at 144 (citing *Mills v. United States,* 599 A.2d 775, 787 (D.C.1991)).

26. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) (No division of the court may overrule another division; only the *en banc* court can accomplish that result.).